GREEN and others, Respondents, v. JONES and others, Co-partners, d/b/a W. J. JONES COMPANY, Appellants.

*March 31—April 28, 1964.*

552

554

For the appellants there was a brief by *Sherman E. Stock* of Milwaukee, and *Mark M. Camp* of Wauwatosa, and oral argument by *Mr. Camp.*

For the respondents there was a brief by *Goldberg, Previant & Uelmen* of Milwaukee, and oral argument by *David Leo Uelmen.*

WILKIE, J.    There are three issues raised on this appeal.

1. *Does sec. 103.50, Stats., create a civil remedy for recovery of wages prescribed by industrial commission regulations promulgated pursuant to the statute, which may be pursued in a judicial forum in the first instance?*

Sec. 103.50 (1), Stats.,[1] provides, in effect, that laborers whose work is in execution of a state highway improvement must be paid a minimum wage which is determined by the industrial commission after public hearings upon data relating to highway construction jobs provided by the state highway commission.

The statute also regulates the hours of employment for workers performing tasks in execution of a highway improvement.

---

[1] "103.50 (1)    *Hours of labor.*  No laborer or mechanic in the employ of the contractor, or of any subcontractor, agent, or other person doing or contracting to do all or a part of the work under a contract based on bids as provided in section 84.06 (2) to which the state is a party for the construction or improvement of any highway, shall be permitted to work a longer number of hours per day or per calendar week than the prevailing hours of labor determined pursuant to this section; nor shall he be paid a lesser rate of wages than the prevailing rate of wages thus determined, for the area in which the work is to be done; except that any such laborer or mechanic may be permitted or required to work more than such prevailing number of hours per day and per calendar week if he shall be paid for all hours in excess of the prevailing hours at a rate of at least 1½ times his hourly rate of pay."

Sec. 103.50 (4), Stats.,[2] provides that after making such determination as to the prevailing wage in the construction area, which is also a "reasonable and living wage," the industrial commission shall certify these figures to the state highway commission. The wage and hour determinations are administrative rules having the force of law. The wage rates are assigned to particular occupational classifications.

Thereafter, the highway commission shall set forth such rates in the "advertisements, proposals and contracts for each highway construction contract to which the state is a party." [3]

Sec. 103.50 (7), Stats., provides for criminal penalties for failure to comply with industrial commission rules in relation to wages and hours for a particular job classification.

Sec. 103.50 (8), Stats.,[4] outlines certain enforcement powers of the highway commission in relation to the substantive provisions of the statute. The commission may require contractors and subcontractors to "furnish copies of any and all pay rolls and it may examine all records relating

---

[2] "103.50 (4) *Certification of prevailing hours and wages.* The industrial commission shall prior to May 1 of the current calendar year certify to the highway commission the prevailing hours of labor and the prevailing wage rate for all such classes of laborers and mechanics in each area. If a construction project extends into more than one area there shall be but one standard of hours of labor and wage rates for the entire project."

[3] Sec. 103.50 (6), Stats.

[4] "103.50 (8) *Enforcement and prosecution.* It shall be the duty of the highway commission to require adherence to subsections (1) and (6). The highway commission may demand and it shall be the duty of every contractor and subcontractor to furnish copies of any and all pay rolls and it may examine all records relating to hours of work and the wages paid laborers and mechanics on the work to which this section is applicable. Upon request of the highway commission or upon complaint of alleged violation, it shall be the duty of the district attorney of the county in which the work is located to make such investigation as necessary and to prosecute violations in a court of competent jurisdiction."

to hours of work and the wages paid laborers and mechanics on the work to which this section is applicable." Upon this data the commission may complain to the district attorney as to violations. The district attorney in turn may seek the criminal penalties outlined in sec. 103.50 (7) (a).[5]

Although the statute does rely upon criminal enforcement, it is clear that the primary purpose of the enactment is to stimulate and protect the economic position of individual workers whose jobs are in execution of a highway improvement. That the statute primarily reinforces individual interests can be seen by reference to a significant item of internal legislative history, 38 Op. Atty. Gen. 481. After this particular opinion was rendered, several legislative changes were made in the statute, none affecting the coverage provisions of sec. 103.50 (1), Stats., construed in the opinion.[6] Therefore, we may consider those portions of the attorney general's opinion relating to the general purpose of the statute, and relating to coverage as being persuasive guides as to the meaning and purpose of the enactment.[7]

The opinion of the attorney general was part of the context in which the 1955 and 1959 re-enactments of sec. 103.50, Stats., took place. As the meaning of the statute depends upon context, the opinion is authoritative internal legislative history.

---

[5] "103.50 (7) *Penalties.* (a) Any contractor, subcontractor or agent thereof who shall violate any of the provisions of this section shall be punished by a fine of not less than $50 nor more than $200, or by imprisonment for not more than 18 months, or by both such fine and imprisonment. Each day that any such violation continues shall be deemed a separate and distinct offense."

[6] Ch. 221, sec. 40, Laws of 1955. Sec. 103.50 (3), Stats., amended to require public hearing as incident of promulgating wages and hours regulations.

Ch. 526, Laws of 1959. Sec. 103.50 (2), Stats., amended to apply to self-employed trucker.

[7] *Wisconsin Valley Improvement Co. v. Public Service Comm.* (1960), 9 Wis. (2d) 606, 101 N. W. (2d) 798; *State ex rel. West Allis v. Dieringer* (1957), 275 Wis. 208, 81 N. W. (2d) 533.

On the matter of general legislative purpose, 38 Op. Atty. Gen. 481, opined at page 482:

"Section 103.50 had its origin in ch. 432, Laws of 1931, and its evident purpose was to insure employment at living wages and prevailing hours of employment. See XX Op. Atty. Gen. 496."

20 Op. Atty. Gen. 496, 497, incorporated in the 1949 opinion, addressed itself to the general legislative purpose of sec. 103.50, Stats., in these terms:

"It is a matter of common knowledge, however, that the legislature had in mind providing as much construction work as practicable to relieve unemployment this season and also had in mind the maintenance of living wages and prevailing hours . . . It seems to me that the intention of the legislature to furnish as much employment as practicable . . . and to maintain . . . living wages and prevailing hours in this employment can be accomplished only by applying the provisions of ch. 432 to those projects, . . ." [8]

Therefore, it is clear that as an incident of public works highway improvements, the legislature intended to generally stimulate economic activity by increasing and reinforcing the purchasing power of individual workers who performed tasks in execution of the highway improvement.

Such interest would obviously not depend upon enforcement of the criminal provisions alone. Sending a contractor to prison or fining him does not enhance the purchasing power of his employees. Therefore, although it is clear that the statute creates a civil remedy on behalf of the drivers, assuming coverage, the precise issue here is, in what forum must they assert their claim in the first instance?

Jones argues that the drivers must "exhaust their administrative remedies" before the highway commission, prior to seeking judicial relief. However, the exhaustion doctrine

[8] 20 Op. Atty. Gen. 496, at p. 497.

is not relevant to the case at hand. Issues surrounding the exhaustion rule arise in cases where a private party is seeking judicial review or judicial relief from a completed administrative determination which affects his interests. Generally, the issue turns on whether the affected party has additional remedies before the administrative tribunal which he must exhaust before seeking judicial review of the legality of the administrative determination.[9]

However, to argue the applicability of the exhaustion doctrine in this case is to assume what is at issue, does the statute provide an administrative remedy upon which the drivers must rely and exhaust in an administrative forum?

Clearly, the drivers are not seeking judicial review of an adverse administrative agency determination, the context of the exhaustion rule; rather they are pursuing the civil remedy in the judicial forum, in conformity with legislative enforcement design. Sec. 103.50, Stats., does not create a quasi-judicial body to conduct hearings in relation to violations of certified wage rates. Statutes providing an administrative forum for enforcement of workers' rights expressly create such a body.[10]

Moreover, the creation of an administrative forum assumes that the members of the tribunal possess certain special skills in evaluating technical factual matters arising out of the subject matter committed to their jurisdiction.[11] While it is true that the highway commission possesses expertise in relation to certain engineering problems in highway construc-

[9] *Nick v. State Highway Comm.* (1961), 13 Wis. (2d) 511, 109 N. W. (2d) 71, 111 N. W. (2d) 95. *Cobb v. Public Service Comm.* (1961), 12 Wis. (2d) 441, 107 N. W. (2d) 595.

[10] Sec. 111.03 to sec. 111.07, Stats., the Wisconsin Employment Relations Board enforcement of unfair labor practice provisions. Sec. 108.09, industrial commission as tribunal for enforcement of unemployment compensation program.

[11] *B. D. C. v. Public Service Comm.*, ante, p. 260, 127 N. W. (2d) 73 (decided March 31, 1964). *Tecumseh Products Co. v. Wisconsin E. R. Board*, ante, p. 118, 126 N. W. (2d) 520.

tion,[12] the commission has no particular expertise in relation to labor economics. Under sec. 103.50, Stats., the determination of the labor classifications, and the wage rates thereunder, is authoritatively made by the industrial commission.

We conclude, therefore, that sec. 103.50, Stats., created no administrative forum for determination of private rights. Since the statute clearly created a private right with a civil remedy, it follows that the legislature intended such interest to be enforced in a judicial forum. The truck drivers properly commenced their action in the circuit court.

2. *Are the truck drivers' activities in the instant case within the coverage of sec. 103.50, Stats.?*

The basic test for determining coverage under sec. 103.50, Stats., was set forth in 38 Op. Atty. Gen. 481, at page 483, which we have seen may be treated as authoritative internal legislative history for this statute:

"The essential question in determining the scope of its applicability is: What operations are part of 'work under a contract' for highway improvement? It is the *character of the particular operation and its relation to the highway improvement which the statute makes determinative, and not the relationship to the state or the principal contractor of the person performing the operation.* If a particular operation constitutes 'work under a contract,' then the principal contractor or any 'subcontractor, agent or other person' doing or contracting to perform that operation is subject to sec. 103.50 (1). It then follows that the wages and hours of any laborer or mechanic in his employ for that purpose are subject to sec. 103.50 (1). *In my opinion 'work under a contract' for a particular highway improvement means the work performed in executing such highway improvement.*" (Emphasis added.)

In response to specific questions the opinion elaborated the coverage tests. If certain materials were stockpiled at the site,

---

[12] *Ashwaubenon v. State Highway Comm.* (1962), 17 Wis. (2d) 120, 115 N. W. (2d) 498.

then coverage depended upon whether the materials were hauled from a commercial pit operating continuously, in which event there would be no coverage, or whether the materials were hauled from a pit opened solely for the purpose of supplying materials, in which event there would be coverage.[13] However, if the materials hauled were immediately utilized on the improvement, the drivers were covered regardless of the source of the material.

"(b) Do truck driver rates certified by the industrial commission apply to drivers for delivery and distribution over the surface of the highway where it can be used without rehandling?

"In my opinion, this operation is part of the work of executing the improvement. It is immaterial whether the person performing it is also the seller of the materials. It is not essential that he have a contract directly with the principal contractor. The wages and hours of his truck driver employes would be subject to sec. 103.50 (1)." [14]

It is clear that the legislature has adopted the functional "work on the site" test of coverage incorporated in the Davis-Bacon Act, federal legislation authorizing the secretary of labor to predetermine minimum wage rates for "mechanics and laborers" on federal construction projects.[15]

---

[13] 38 Op. Atty. Gen. 481, 483.

[14] Ibid., p. 484.

[15] 40 U. S. Code, sec. 276a: "[That] the advertised specifications for every contract in excess of $2,000, to which the United States or the District of Columbia is a party, for construction, . . . of public buildings or public works of the United States . . . which requires or involves the employment of mechanics and/or laborers shall contain a provision stating the minimum wages to be paid various classes of laborers and mechanics which shall be based upon the wages that will be determined by the Secretary of Labor to be prevailing for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work in the city, town, village, or other civil subdivision of the State . . . in which the work is to be performed, . . . and every contract based upon these specifications shall contain a stipulation that the

The Davis-Bacon Act was enacted in 1931, at nearly the same time that sec. 103.50, Stats., became law.

In the instant case, although the drivers hauled materials from both commercial and *"ad hoc"* pits, such materials were immediately distributed over the surface of the roadway. The drivers' tasks were functionally related to the process of construction. The crushed base for the first layer of the highway above the ground was dumped or spread by the drivers and immediately leveled by graders under the supervision of the general contractor. The crushed base and granulated subbase for shoulder material was dumped on the highway and immediately pushed onto the shoulder and leveled by the general contractor's graders. The aggregate, utilized as filler in the concrete, was dumped adjacent to a ready-mix concrete set up. The aggregate was immediately mixed with cement, and the concrete was then immediately laid upon the highway strip.[16]

Clearly, the materials were applied to the process of highway improvement, almost immediately after the drivers arrived at the site. The delivery of materials was an integrated aspect of the "flow" process of construction. The materials were "distributed over the surface of the roadway" with no

contractor or his subcontractor shall pay all mechanics and laborers employed directly upon the site of the work, . . . the full amounts accrued at time of payment, computed at wage rates not less than those stated in the advertised specifications, . . ."

[16] In *Brogan v. National Surety Co.* (1918) 246 U. S. 257, 38 Sup. Ct. 250, 62 L. Ed. 703, the United States supreme court, in construing a federal statute which applied to persons who "furnished labor or materials used in the construction or repair," held that the extent of a supplier's involvement in the construction work depended on the function he performed in connection with the work. Following this guide line, the Secretary of Labor has determined that truck drivers carrying aggregate to be used in mixing concrete at the construction site are performing work on the site within the meaning of the Davis-Bacon Act. See Tyson, Prevailing Wage Determinations in the Construction Industry: Some Legal Aspects, 1952 Wisconsin Law Review, 440, 456.

"rehandling" out of the flow of construction. The drivers were "executing such highway improvement" and hence performing "work under the contract." [17]

3. *Is Occupation 24 of the 1957 industrial commission job classification and wage-structure rules promulgated pursuant to sec. 103.50, Stats., the appropriate classification for these truck drivers, rather than Occupation 25, a classification prescribing a lower hourly wage rate?*

The final issue confronting the trial court was whether Occupation 24: Driver of Semi-Trailer Truck or Tractor Unit (under 10-cubic-yard struck capacity), or Occupation 25: Truck Driver, Dump (sand, gravel, stone), applied to the men in the instant case. Occupation 24 provided a higher rate. Jones paid the drivers the rate applicable to Occupation 25.

The record reveals that the drivers operated "tandem trucks," with 10-cubic-yard struck capacity. "Tandem trucks" could refer to either semitrailer trucks or tractor unit trucks, or dump trucks. Some trucks are composed of a tractor, and several "dump" trailers attached in tandem Hence the record reveals no rational criteria for choice in terms of the design of the trucks.

The second criteria for classification set forth in the industrial commission regulations is material hauled. If the truckers were carrying "sand, gravel, and stone" then they were paid the appropriate rate.

The truckers, on the projects in which the trial court found violations of the industrial commission rules, were carrying materials described variously as "pit run," "crushed base," and "sand lift." They also carried granulated subbase, referred to popularly as "crushed stonebase." These products are a fine particle material, largely sand, or crushed gravel, or crushed stone. This fine material is used for

---

[17] 38 Op. Atty. Gen. 481, 483.

shoulder repair, and is the subbase upon which the concrete is laid. Mr. Hicks, construction engineer for the highway commission, testified that in the commission's view, "sand, gravel, and stone" described the shoulder material and the highway base transported by the drivers. However, Mr. Hicks testified the term "stone" in construction-trade usage referred to aggregate used as filler in cement rather than to the fine materials described above, which are used as subbase and backfill material.

The highway commission's specifications for road construction for 1957 distinguish between materials used for subbase which shall consist of "sand or a mixture of sand with gravel, crushed gravel, crushed stone or other broken or fragmented material which has sufficient fine material to fill all the voids in the coarser material," [18] and materials which shall be used as aggregate for cement concrete. The latter materials are described as "Fine Aggregate [which] shall consist of a combination of sand with fine gravel, crushed gravel or crushed stone consisting of hard, strong, durable particles" and "Coarse Aggregate [which] shall be clean, hard, durable gravel, crushed gravel, or crushed stone free from an excess of thin, elongated pieces, frozen lumps, vegetation or deleterious substances, and adherent coatings which would be considered as injurious." [19]

However, both of these kinds of materials are most rationally subsumed under the generic label "sand, gravel, and stone" for the purposes of wage-rate classifications.

This classification would distinguish drivers who might transport clay or topsoil from the drivers in the instant case. Neither clay or topsoil fits the description of materials set forth in Specifications 3106.03 or 3103.03 and 3103.05.

---

[18] State Highway Commission of Wisconsin Standard Specifications for Road and Bridge Construction, Edition of 1957, sec. 3106.03, p. 443.

[19] Id. secs. 3103.03 and 3103.05, at pp. 436, 439.

Moreover, there is no rational basis for distinguishing drivers transporting aggregate from drivers transporting pit run, or crushed base, under the circumstances of this case. All drivers operated vehicles of the same design and capacity. Hence it is reasonable to believe that the drivers had a parity of skills. We have seen that all the material delivered was immediately integrated into the construction process. Hence, the drivers' relationship to the improvement project was similar. Given the fact that the drivers operated trucks of identical capacity, and the fact that Jones was compensated on a tonnage basis, the "aggregate" drivers are not inherently less "productive" than the pit-run drivers.

Finally, the highway commission's view of the matter is entitled to some particular weight. It is true that the final determination of the appropriate wage rate rests with the industrial commission. However, the statute provides that the highway commission will supply the industrial commission with relevant data. In those situations where the details of highway construction, and more specifically the nature of the construction materials hauled, determine the wage rate, the highway commission's view of the appropriate rate is entitled to considerable weight.

All of the above factors in combination lead us to conclude that all drivers should have been paid the rate applicable to Occupation 25 for 1957. The trial court properly concluded that the drivers hauling aggregate should have been compensated at the rate established by Occupation 25.

Therefore, the conclusions of law and that part of the judgment thereon relating to the Griffith project and the F. F. Mengel project, where the drivers were paid the Occupation 25 rate, are affirmed. The conclusions of law and that part of the judgment thereon relating to the R. & W. Construction Company projects, the Joseph D. Bonness, Inc., projects, Kramp Construction projects, and the C. C. Link

project, are reversed. The wage rate for Occupation 25 for 1957 in Racine and Kenosha must be applied in these projects.

On remand the trial court shall amend the money judgments to specific individuals in conformity with this result.

*By the Court.*—That part of the judgment relating to wage rates on the Griffith and F. F. Mengel projects is affirmed. That part of the judgment relating to wage rates on the R. & W. Construction Company, the Joseph D. Bonness, Inc., the Kramp Construction, and the C. C. Link projects, are reversed and remanded for further proceedings not inconsistent with this opinion.

GORDON, J., took no part.