WISCONSIN FERTILIZER ASSOCIATION, INC., and another, Respondents, v. KARNS, Administrator, Division of Motor Vehicles, Appellant. [Case No. 123.]

AMERICAN OIL COMPANY, Appellant, v. KARNS, Administrator, Division of Motor Vehicles, Respondent. [Case No. 124.] *

*Nos. 123, 124. Argued September 7, 1971.—Decided October 8, 1971.*
(Also reported in 190 N. W. 2d 513.)

*Motion for rehearing denied, with costs, on January 4, 1972.

312

314

For the appellant in Case No. 123 the cause was argued by *E. Gordon Young*, assistant attorney general, with whom on the brief were *Robert W. Warren*, attorney general, and *Richard E. Barrett*, assistant attorney general.

For the appellant in Case No. 124 there were briefs by *Quarles, Herriott, Clemons, Teschner & Noelke*, attorneys, and *Maxwell H. Herriott* and *Frank J. Daily* of counsel, all of Milwaukee, and oral argument by *Maxwell H. Herriott*.

For the respondents in Case No. 123 there was a brief by *Willink & Thompson* of Madison, and oral argument by *Dale R. Thompson*.

For the respondent in Case No. 124 the cause was argued by *E. Gordon Young*, assistant attorney general, with whom on the brief was *Robert W. Warren*, attorney general.

HEFFERNAN, J. The statute involved, sec. 340.01 (24), provides:

" 'Implement of husbandry' means a vehicle or piece of equipment or machinery designed for agricultural purposes, used exclusively in the conduct of agricultural operations and used principally off the highway."

When statutory language is clear and unambiguous, the judiciary is not permitted to construe a statute but must apply it by giving the language the meaning that is apparent from the literal words of the statute. *Na-*

*tional Amusement Co. v. Department of Revenue* (1969), 41 Wis. 2d 261, 163 N. W. 2d 625. On the other hand, when the plain meaning is not apparent when read literally, a court is obliged to attempt to determine the legislative intent and must construe the statute in accordance with the legislature's purpose. *State ex rel. Gutbrod v. Wolke* (1971), 49 Wis. 2d 736, 183 N. W. 2d 161.

The terms appearing in sec. 340.01 (24), Stats., have meanings that are not clear and unequivocal upon their face. Well-informed and reasonable persons might well differ, as they have in these cases, over the meaning of the phrases, "designed for agricultural purposes," "used exclusively in the conduct of agricultural operations," and "used principally off the highway."

We are satisfied that the statute is ambiguous and requires a judicial construction.

It is the position of the Wisconsin Fertilizer Association and the American Oil Company that the terms should be construed liberally in the interests of furthering the legislative intent, which, they contend, is to advance the art of agriculture in Wisconsin. In the *Fertilizer Case,* for example, it is argued that "agricultural operations" includes, almost without limitation, all the activities involved in the transportation of tools, commodities, and raw materials to and from the farm. The state in both cases argues that there be a strict construction and the meaning of the terms be limited to those activities that occur in the normal course of the farmer's business of farming, that the vehicles must be owned by the farmer, and that there be no commercial activity involved other than the commerce of the farmer himself.

The exemption for "implements of husbandry" appears in ch. 340, Stats. That chapter is captioned, "General Provisions, Title XXXII Vehicle Code." The entire pur-

port of Title XXXII is the furtherance of highway safety, and any exceptions that appear in the code must be strictly limited to further the purpose of the legislature to assure that vehicles on the highway be safe and be operated by competent drivers.

The committee drafting the revision of the 1957 vehicle code, in its note to the statutory definition of "implements of husbandry" in sec. 340.01 (24), Stats., referred to prior attorneys general's opinions which dealt with that term. We have previously stated that, where opinions of the attorney general are followed in new legislation or where there is an apparent intent to conform the statutory meaning to these prior interpretations, such opinions are an authoritative part of the legislative history and may be relied upon in the process of judicial construction. *State v. Ludwig* (1966), 31 Wis. 2d 690, 698, 143 N. W. 2d 548; *Green v. Jones* (1964), 23 Wis. 2d 551, 558, 128 N. W. 2d 1. The term, "implements of husbandry," was dealt with in 28 Op. Atty. Gen. (1939), 311, 30 Op. Atty. Gen. (1941), 312, and 44 Op. Atty. Gen. (1955), 103. All these opinions were prior to the enactment of the statutory definition. They are indicative of the fact that the committee, in its goal to pattern the meaning of the statute on these prior attorneys general's opinions, intended a strict construction of the statute.

The new statute was construed for the first time in an opinion of the attorney general dated May 13, 1958, 47 Op. Atty. Gen. 112. That opinion stated at page 113, ". . . all doubts [should] be resolved in favor of the general provision rather than the exception." That opinion strictly construed exceptions to the vehicle code. We agree that such construction was proper and, in view of the context in which the exceptions appear, those provisions which exempt "implements of husbandry" are to be strictly limited and, wherever any ambiguity ap-

pears, the general legislative purpose of vehicle safety is controlling.

Although exemptions to safety statutes are to be strictly construed, we cannot agree with the state's contention that the vehicle must be owned by the farmer. We see nothing in the attorneys general's opinions upon which we have relied as a portion of the statute's legislative history to compel the conclusion that the exemption is lost in the event the vehicle is not owned by the farmer who uses it in his own agricultural operations. In other sections of the vehicle code (*e. g.*, secs. 340.01 (17) and 340.01 (18), Stats.), the legislature required ownership as a condition of exemption. Such a requirement is not made in connection with the exception under sec. 340.01 (24), and we are satisfied that the omission of the ownership requirement shows that ownership was not intended as a pre-condition of the exemption.

The legislative history shows that the interpretation urged by the Wisconsin Fertilizer Association and the American Oil Company which would liberally construe the phrases, "agricultural operations" and "agricultural purposes," to include the transportation of any commodities whatsoever to and from the farm is incorrect. The principal statute is the Vehicle Safety Law. Its primary purpose is wholly unrelated to agriculture. It is our opinion, therefore, that the rule of construction urged by the state, if the element of ownership is excluded from it, is proper in this case. We construe the term, "agricultural operations," to refer to farming operations only. This construction is similar to the interpretation made by the attorney general in 28 Op. Atty. Gen. (1939), 311, wherein it was said at page 311, "An implement of husbandry is something necessary to the carrying on of the business of farming."

Having in mind the standards to be used in interpreting the statute, it becomes necessary to consider, in light

of the trial court's findings of fact, whether each of the vehicles in question conforms to the requirements for the exemption.

"Nurse" tanks are involved in both cases. They are used to transport liquid fertilizer over the highways to farmers' fields. The trial judge found that most of the time these tanks while on the farm are used for storage in the field; and in the absence of the new technique, where a tool bar applicator is utilized, they are used to supply the smaller tanks on liquid fertilizer applicators.

In addition to having pressurized "nurse" tanks, non-pressurized tanks are also available. These also may have application booms attached, but usually these tanks are used to supply smaller applicators.

"Nurse" tanks are large vehicles. They contain approximately 1,000 gallons, although they are available with a 1,500 gallon capacity. There was testimony that one of these vehicles, fully loaded, weighed about six tons.

To qualify for the exemption as an "implement of husbandry," sec. 340.01 (24), Stats., requires that the vehicle must be: (1) Designed for agricultural purposes; (2) used exclusively in the conduct of agricultural operations; and (3) used principally off the highway.

In Case No. 123 (the *Fertilizer Case*) the trial judge found that "nurse" tanks were not designed for agricultural purposes. In Case No. 124 (the *American Oil Case*) a contrary finding was made.

It appears that at the time Case No. 124 was decided, "nurse" tanks were no longer designed only for hauling and storage but, by the addition of flotation tires and a movable tongue, could be pulled in the field for application of the fertilizer through a coupled tool bar.

The first requirement, unlike the second, does not contain the requirement of exclusivity. It would appear,

therefore, that "nurse" tanks, with or without flotation tires and movable tongue, were designed for some agricultural purpose; and it is irrelevant in respect to this first requirement that they were also designed for the nonfarming function of transportation and storage.

In each case the trial judge found that the "nurse" tanks were not used *exclusively* in agricultural operations. The term, "agricultural operations," required by the second proviso of sec. 340.01 (24), Stats., was construed strictly by the trial court, a construction with which we are in accord. The trial court pointed out that the "nurse" tanks were not used exclusively in the conduct of farming operations but were used, in addition, for the commercial hauling and storage of fertilizer.

We are satisfied that the factual basis of the trial court's finding is not contrary to the great weight and clear preponderance of the evidence, and we agree that the term, "agricultural operations," is properly limited to mean that the use of the vehicle must be in operations directly pertaining to the business of farming. Such interpretation was adumbrated in *Wisconsin Fertilizer Asso. v. Karns* (1969), 43 Wis. 2d 30, 34, 168 N. W. 2d 206, wherein this court said:

"If sec. 340.01 (24), Stats., is construed to mean that vehicles must be used *exclusively* in farming operations as opposed to commercial activities in order to qualify as 'implements of husbandry,' then *any* 'commercial' use of the vehicles in question would preclude their classification as 'implements of husbandry.' "

It is clear that this is the construction intended by the legislature. The exemption was not intended for the commercial haulers of commodities but only for the benefit of farmers in the course of farming operations. The trial court found that the "nurse" tanks were not used principally off the highway, but were rather principally used on the highway to haul liquid fertilizer to the field.

The finding is not contrary to the great weight and clear preponderance of the evidence. On a different set of facts, at a time when the tool bar method has received greater acceptance than it had on the date of trial, it might well be found that the principal use of these vehicles was off the highway. The evidence in this record could not justify that finding.

In Case No. 123 (the *Fertilizer Case*), the trial court found that the bulk dry fertilizer applicators were designed for agricultural purposes, that they were used exclusively in the conduct of agricultural operations, and that their use was principally off the highway. The court held that these vehicles were "implements of husbandry" and met all three of the statutory requirements. We are satisfied that the factual findings in regard to the bulk fertilizer applicators were not contrary to the great weight and clear preponderance of the evidence. It is apparent that the bulk fertilizer applicators, constructed with a conveyor belt and spreader as an integral part of the mechanism, could be used for the purpose for which they were designed only on the farm. As the trial judge stated, they are simply a modern version of the venerable manure spreader.

The trial court's finding that the vehicles were used exclusively in the conduct of agricultural operations is a far closer question. If the phrase, "agricultural operations," is strictly construed to mean only those operations on the farm necessary to the farmer's business, then the fact that these vehicles were used in a commercial operation of transporting the fertilizer to the farm indicates they were in part used in a commercial operation and not exclusively in the operations on the farm. However, we conclude that, in view of the design of these vehicles, which is peculiarly adapted for the spreading of fertilizer, the transportation of the bulk load to the farmer's field is merely a slight, incidental use of the vehicle.

These vehicles are unlike the "nurse" tanks, which have no use in farming operations on the farm unless they are rigged with a tool bar applicator. We conclude that these bulk dry fertilizer applicators were used exclusively in farm operations.

The trial judge also found that the use of the bulk fertilizer applicators was principally off the highway. This finding is not contrary to the great weight and clear preponderance of the evidence.

We conclude, therefore, that the trial judge properly found that the bulk fertilizer vehicles were "implements of husbandry."

In Case No. 123 it appears that no finding was made on the question of whether liquid fertilizer applicators were "implements of husbandry." The trial judge took the position that the state had not contested the Fertilizer Association's assertion in this respect. Moreover, the state did not appeal from the trial judge's holding that liquid fertilizer applicators met all the tests required to conclude that they were "implements of husbandry." In Case No. 124, the American Oil Company appealed from that portion of the judgment adverse to it. The state filed a motion for review of that portion of the judgment which held that the liquid fertilizer applicators were "implements of husbandry." Although there is some foundation to American Oil's assertion that the motion for review was not timely made, we conclude that it is in the public interest to decide the question on this appeal.

The function of the liquid applicators has been discussed. They were comparatively small units not used for highway transportation of fertilizer and were used exclusively on the farm. The trial judge, on a record undisputed in this respect, found that the liquid applicators met the three tests to qualify as "implements of husbandry." The state's only argument is that the use

of the applicator is a part of the chain of commerce in which the suppliers of fertilizer are engaged. Under this test, no vehicle of any design, ownership, or use which utilized a commercially sold product could qualify for the exemption. Such interpretation would make the legislatively granted exemptions a complete nullity. The interpretation urged by the state would reduce the statutory exemption to an absurdity. If the test were valid, no other criteria could be of significance. We cannot conclude that the legislature intended to promulgate a nonsensical statute.

The liquid fertilizer applicators, in both cases, were properly held to be "implements of husbandry."

It is equally clear that the tool bar mechanism qualified for the statutory exemption.

*By the Court.*—Judgments affirmed.

WILKIE, J. (*dissenting in part*). In Case No. 123, I disagree with the majority that the bulk dry fertilizer applicators are implements of husbandry, within the meaning of sec. 340.01 (24), Stats. These applicators are large, four-wheel trailers, which carry up to eight tons of dry fertilizer. They have two purposes: (1) to spread the dry fertilizer on the field, and (2) to carry it from the source of supply to the field. To be an implement of husbandry, the applicator must be used exclusively in the conduct of agricultural operations. As the majority notes, "agricultural operations" do not include the commercial hauling of fertilizer. These bulk dry fertilizer applicators are used partially for this purpose. The majority concludes that "the transportation of the bulk load to the farmer's field is merely a slight, incidental use of the vehicle." Even if this is true, the applicators would not be used exclusively in agricultural operations as required by the statute. The statute does not say that implements of husbandry are those used

"substantially" or "predominantly," but "exclusively." Moreover, on the facts of this case, the use of these vehicles in the transport of fertilizer from the source of supply to the field is not just an incidental use. Rather, it is clear that an integral part of respondents' business is commercial, not agricultural, and for that reason I cannot agree with the conclusion that these applicators are used exclusively for agricultural operations.

The section exempting implements of husbandry from the various aspects of the highway safety statute was designed to allow farmers to run farm vehicles without having to comply with some of the requirements for highway vehicles.[1] The result here does not assist the farmer. It assists those who commercially furnish the applicators.

The practical result of the majority decision is to allow these vehicles to travel extensively on public highways without operators' permits, without taillights, without brakes, and without brake lights. Such trailers on the highway constitute significant safety hazards to the motoring public. Although the majority acknowledges that exemptions from safety statutes are to be strictly construed, the majority finds that these trailers are to be exempted as found by the trial court. Highway safety is of such primary importance that these vehicles should be made to comply with the highway safety laws. I would, therefore, reverse the circuit court's ruling on these applicators.

[1] *Cf. Holton & Hunkel Greenhouse Co. v. State* (1957), 274 Wis. 337, 343, 344, 80 N. W. 2d 371.