[Civ. No. 45232. Second Dist.. Div. Three. Feb. 19. 1976.]

O. G. SANSONE CO. et al., Plaintiffs and Appellants, v.
DEPARTMENT OF TRANSPORTATION,
Defendant and Respondent.

## COUNSEL

Grant & Popovich and Irvin Grant for Plaintiffs and Appellants.

Harry S. Fenton, Kingsley T. Hoegstedt, Orrin F. Finch and William B. Bassett for Defendant and Respondent.

Van Bourg, Allen, Weinberg, Williams & Roger, Victor J. Van Bourg and David A. Rosenfeld as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**FORD, P. J.**—Plaintiffs O. G. Sansone Co. and Robert E. Fulton Co.; as joint venturers, were prime contractors for defendant Department of Transportation on a federally funded public works project for the construction of 17.4 miles of Interstate Highway 5 in Kings County, California. After plaintiffs' work on the project had been accepted as complete, defendant withheld from the amount earned by plaintiffs the sum of $29,578.65 on the ground that there had been violations of both state and federal laws relating to the payment of prevailing wages on a public works construction project. Thereafter plaintiffs brought this action seeking declaratory relief with respect to the constitutionality of Labor Code sections 1726, 1727 and 1775 and the Work Hours Standards and Safety Act of 1962 and with respect to the applicability of those statutes under the circumstances of this case. Plaintiffs also sought release of the sum withheld from them by defendant.

At the trial the case was submitted by plaintiffs and defendant on the "facts established by the pleadings, Answers to Interrogatories, response to Request for Admissions, and stipulation of the parties," as well as certain other evidence which was documentary in nature. The court made findings of fact and conclusions of law and rendered its judgment in favor of defendant.

The trial court found that defendant awarded to plaintiffs the contract to construct 17.4 miles of Interstate Highway 5 in Kings County, California, which was to be part of the Federal Interstate Highway System, for the bid sum of $7,656,921.80. The contract included, among other matters, the general prevailing wage rate publication dated May 1970. The construction involved federal financing. Federal prevailing wage rate provisions were included in section 5-2 of the contract special provisions.

Plaintiffs subcontracted pay item 18 under the contract which called for "incorporation of approximately 126,000 cubic yards of Class 3 aggregate subbase into the construction project." On June 23, 1971, plaintiffs requested "that the STATE approve an intention to subcontract 33 percent of pay item 18 to L. D. Folsom, Inc., of Coalinga, California, that work being loading, placing, and compacting of the material, and 41 percent of pay item 18, involving hauling only, to Wright Brothers Transportation of Visalia, California." The state approved the request as to a subcontract with Wright Brothers on July 21, 1971.

Plaintiffs entered into an agreement, designated as a subcontract, with Buddy Wright, an individual doing business as Wright Brothers Transportation, which incorporated the provisions of the prime contract and directed the attention of the subcontractor to section 7 of the State Highway Contract Special Provisions entitled "Federal Requirements for Federal Aid Construction Projects."

Wright Brothers Transportation (hereinafter designated as "Wright") subcontracted a portion of its work to John W. Heck Trucking, Inc. (hereinafter designated as "Heck"). The court found that "there was no privity of contract between plaintiffs and Heck, and Heck was never specifically requested as a subcontractor nor approved by the State . . . but did function as a second-tier subcontractor to Wright." At all times herein involved Wright and Heck were "independent truckers serving the general public" and at no time were they licensed as contractors by the State of California.

Wright and Heck hauled "Class 3 aggregate subbase materials from locations not on the project site, but located adjacent to and established exclusively to serve the project site pursuant to private borrow agreements between plaintiffs and third parties."

The court found that from June 21, 1971, through July 14, 1971, and from September 8, 1971, through October 19, 1971, and on November

23, 1971, employees of Wright and Heck worked on the project and during that time Wright and Heck "submitted false and fraudulently certified weekly payroll documents to plaintiffs for submission to the State" and that those "certified documents purported to evidence the payment of at least the minimum contract prevailing wage rates specified to the employees of WRIGHT and HECK." The state notified plaintiffs by letter dated December 23, 1971, that Wright and Heck had failed to pay prevailing wages and fringe benefits to their employees pursuant to the terms of the contract. Plaintiffs' work was accepted by the state as having been completed and notice of completion was filed on February 29, 1972.

As a result of the wage underpayments and violations of both state and federal prevailing wage laws, the state withheld the sum of $29,578.65 from money earned by plaintiffs. The state determined that the underpayment of wage and fringe benefits with respect to the employees of Wright and Heck and the penalties resulting therefrom were as follows:

| | "Wage and Fringe Benefits | State Penalties | Federal Penalties |
| --- | --- | --- | --- |
| Wright Brothers Transportation | $8,102.45 | $9,850.00 | $1,470.00 |
| John W. Heck Trucking, Inc. | $4,677.96 | $9,850.00 | $1,340.00" |

The court further found: "Plaintiffs were not given prior notice, apart from the language of the controlling State and Federal statutes and the terms of the contract documents, that defendants would withhold amounts earned by plaintiffs for work performed on the project by reason of the specific alleged failure of WRIGHT and HECK to pay prevailing wages. [¶] . . . There was no hearing conducted by defendant, either prior to or subsequent to the withholding of amounts earned by plaintiffs for work performed on the project here involved by reason of the failure of WRIGHT and HECK to pay the contract minimum prevailing wage rates."

Plaintiffs filed a claim with the State Board of Control which was denied. Thereafter this action was timely commenced.

I

## The Coverage Issue

At the times pertinent herein Labor Code section 1771 provided as follows: "Not less than the general prevailing rate of per diem wages for work of a similar character in the locality in which the public work is performed, and not less than the general prevailing rate of per diem wages for holiday and overtime work fixed as provided in this chapter, shall be paid to all workmen employed on public works exclusive of maintenance work." Labor Code section 1772 was as follows: "Workmen employed by contractors or subcontractors in the execution of any contract for public work are deemed to be employed upon public work." Labor Code section 1774 provided: "The contractor to whom the contract is awarded, and any subcontractor under him, shall pay not less than the specified prevailing rates of wages to all workmen employed in the execution of the contract."

Plaintiffs contend that the California and federal statutes relating to payment of prevailing wages on public works projects apply only to wages paid by either the contractor or a subcontractor and that Wright and Heck were not subcontractors within the meaning of the state and federal prevailing wage statutes.

We have found no California cases discussing who is and who is not a subcontractor under the state's prevailing wage laws. In contending that Wright and Heck were not subcontractors under the circumstances of this case, plaintiffs rely on cases dealing with the definition of a subcontractor under the mechanic's lien law. (*Theisen* v. *County of Los Angeles*, 54 Cal.2d 170, 183 [5 Cal.Rptr. 161, 352 P.2d 529]; *Hihn-Hammond Lumber Co.* v. *Elsom*, 171 Cal. 570, 574-575 [154 P. 12]; *George F. Kennedy, Inc.* v. *Miles & Sons Constr. Division*, 5 Cal.App.3d 516, 520 [85 Cal.Rptr. 298].) In *Theisen* a subcontractor is defined as follows (54 Cal.2d at p. 183): ". . . one who agrees with the prime contractor to perform a substantial specified portion of the work of construction which is the subject of the general contract in accord with the plans and specifications by which the prime contractor is bound has 'charge of construction' of that part of the work of improvement (Code Civ. Proc., § 1182, subd. (c)) and is a subcontractor although he does not undertake to himself incorporate such portion of the projected structure into the building."

However, the reasoning of another case, also cited by plaintiffs, affords more guidance with respect to the resolution of the question presented in this case. In *H. B. Zachry Company* v. *United States* (1965) 344 F.2d 352 [170 Ct.Cl. 115], the federal court considered whether a trucking company was a subcontractor under the provisions of the Davis-Bacon Act (40 U.S.C. §§ 276a to 276a-7), the federal prevailing wage statute. In *Zachry* the plaintiff was the prime contractor for the United States with respect to two construction projects at Holloman Air Force Base. One of the projects called for the construction of the principal runways and adjacent aprons and the other called for the construction of certain aircraft parking areas. To perform the contracts plaintiff had to acquire certain materials including "base material, concrete aggregate, hot mix and sand." It is stated in the court's opinion that these materials were "standard commercial materials and were not specially designed for this project." (344 F.2d at p. 354.) Since local suppliers of these materials were unable to make delivery, plaintiff contracted with Glover Distributing Company to transport the materials to the project site. "The agreement, which was denominated a 'Subcontract,' contained a requirement that Glover comply with all 'applicable Federal and State Labor Laws and Regulations.' " (344 F.2d at p. 354.) Glover contracted with other truck owners to supply all the necessary transportation to complete the performance of its contract. In determining whether Glover was a subcontractor under the Davis-Bacon Act, the court looked to the administrative interpretations of the statute by the Secretary of Labor. The court noted (344 F.2d at p. 359): "Beginning as early as 1942 [fn. omitted], the Solicitor [of the Department of Labor] has excluded from statutory coverage the employees of bona fide materialmen who sell to a contractor engaged in construction contracts covered by the Davis-Bacon Act. The exemption has been qualified to the extent that the materialman must be selling supplies to the general public, the plant must not be established specially for the particular contract, and the plant is not located at the site of the work. [Fn. omitted.] The Solicitor has always held that truck drivers employed by materialmen (exempt from statutory coverage) to transport supplies to the jobsite are no more subject to the provisions of the Davis-Bacon Act and the Eight-Hour Laws than are other employees of the materialmen. [Fn. omitted.]"

In *Zachry* the court held that Glover was not a subcontractor, stating (344 F.2d at pp. 360-361): "The suppliers from which the material for the contracts in suit were obtained were in the business of selling such materials to the general public and were not established specifically to furnish materials for plaintiff's contracts. Glover was and is an indepen-

dent trucking concern and indeed appears to have been the major transporter of construction materials in the area. . . . [¶] In this case we hold that Glover's employees were not covered by the labor statutes because of the nature of the function Glover performed, namely, the delivery of standard materials to the site—a function which is performed independently of the contract construction activities. We think this decision is a logical extension of the congressional intent to exclude employees of materialmen from the coverage of the Davis-Bacon Act."

In the case presently before this court the subbase materials were not obtained from an established independent material supplier. Rather, as stipulated by the parties: "28. The subbase materials hauled by Wright Bros. Transportation and John W. Heck Trucking, Inc. were not furnished to plaintiffs by the State of California; the subbase materials were acquired by plaintiffs from third parties pursuant to private borrow agreements. [18] [¶] 29. The subbase materials hauled by Wright Bros. Transportation and John W. Heck Trucking, Inc. were taken from locations adjacent to and established exclusively to serve the project site, though not located physically on the project site, and were delivered by the said firms to the project site. [18]"

The parties further stipulated as follows: "30. The subbase materials hauled by Wright Bros. Transportation and John W. Heck Trucking, Inc. were used by plaintiffs in the performance of work item 18 of the prime contract identified as: Class 3 Aggregate Subbase."

In section 25-1.01 of the Standard Specifications the work to be performed under work item 18 of the prime contract was described as follows: "This work shall consist of *furnishing,* spreading and compacting aggregate subbases as specified in these specifications and the special provisions." (Italics added.) Plaintiffs did not furnish the subbase materials by securing them through a standard commercial supplier. Instead plaintiffs acquired the materials "from third parties pursuant to private borrow agreements." In performance of plaintiffs' agreement to furnish these subbase materials under the prime contract, plaintiffs subcontracted the hauling of the materials from the locations "adjacent to and established exclusively to serve the project site."

In *Green v. Jones,* 23 Wis.2d 551 [128 N.W.2d 1], the court sought to determine whether employees of a trucking firm were covered under Wisconsin's legislation which provided for the payment of wages at the prevailing rate for the area to employees of the contractor or of any subcontractor on a highway construction project. W. J. Jones Co., a

trucking firm, delivered various roadbed materials to the site of highway improvement projects on which at least seven different general contractors were engaged. On some projects Jones contracted with the materialmen to deliver the materials to the site; in other projects Jones contracted directly with the general contractor to make such delivery.

In the course of determining whether Jones' employees were covered under the state's prevailing wage law the court made reference to an opinion of the Wisconsin Attorney General (38 Ops.Wis.Atty.Gen. 481, 483) which the court treated as embodying authoritative internal legislative history of the statute. The court stated (128 N.W.2d at p. 6): "In response to specific questions the opinion elaborated the coverage tests. If certain materials were stockpiled at the site, then coverage depended upon whether the materials were hauled from a commercial pit operating continuously, in which event there would be no coverage, or whether the materials were hauled from a pit opened solely for the purpose of supplying materials, in which event there would be coverage. [Fn. omitted.] However, if the materials hauled were immediately utilized on the improvement, the drivers were covered regardless of the source of the material."

The Wisconsin court decided that Jones' employees were covered because under the facts of that case the materials hauled were dumped or spread directly on the roadbed and were immediately used in the construction of the project. Thus, the court stated (128 N.W.2d at p. 7): "In the instant case, although the drivers hauled materials from both commercial and 'ad hoc' pits, such materials were immediately distributed over the surface of the roadway. The drivers' tasks were functionally related to the process of construction. The crushed base for the first layer of the highway above the ground was dumped or spread by the drivers and immediately leveled by graders under the supervision of the general contractor. The crushed base and granulated sub-base for shoulder material was dumped on the highway and immediately pushed onto the shoulder and leveled by the general contractor's graders. The aggregate, utilized as filler in the concrete, was dumped adjacent to a ready-mix concrete set up. The aggregate was immediately mixed with cement, and the concrete was then immediately laid upon the highway strip. [Fn. omitted.] [¶] Clearly, the materials were applied to the process of highway improvement, almost immediately after the drivers arrived at the site. The delivery of materials was an integrated aspect of the 'flow' process of construction. The materials were 'distributed over the surface of the roadway' with no 'rehandling' out of the flow of construction. The

drivers were 'executing such highway improvement' and hence perform-
ing 'work under the contract.' [Fn. omitted.]"

■ In the case presently before this court plaintiffs. contracted to
furnish the subbase material. In order to fulfill the contract, plaintiffs
entered into private borrow agreements with third parties so as to obtain
borrow sites designed to supply the project site exclusively with subbase
materials and plaintiffs contracted with Wright to haul the material to
the adjacent project site. Wright and Heck were not materialmen or
employees of materialmen. Rather, plaintiffs contracted with Wright to
perform an integral part of plaintiffs' obligation under the prime
contract. The trial court properly determined that under the circum-
stances of the instant case Wright and Heck were subcontractors.

II

THE DUE PROCESS ISSUE

Plaintiffs contend as follows: "No person may be deprived of his
property without prior notice of proceedings held for such purpose and
an opportunity to be heard therein. Such notice and an opportunity to be
heard must be provided by the statute itself. Defendant has withheld
funds admittedly earned by plaintiffs to pay additional wages to
employees of subcontractors and to satisfy penalties and forfeitures
provided by law for violation of the prevailing wage laws. The statutes
upon which the State of California relies in this matter provide for the
appropriation of plaintiffs' property to satisfy claims and penalties that
are the responsibility of a subcontractor without provision for notice or
hearing in violation of the constitutional guarantees of due process of
law."

The statutory scheme which plaintiffs challenge herein provides for a
penalty or forfeiture in the event of violations of the prevailing wage
provisions. Labor Code section 1775 is in pertinent part as follows: "The
contractor shall, as a penalty to the State or political subdivision on
whose behalf the contract is made or awarded, forfeit twenty-five dollars
($25) for each calendar day, or portion thereof, for each workman paid
less than the stipulated prevailing rates for such work or craft in which
such workman is employed for any public work done under the contract
*by him or by any subcontractor under him.* The difference between such
stipulated prevailing wage rates and the amount paid to each workman
for each calendar day or portion thereof for which each workman was
paid less than the stipulated prevailing wage rate shall be paid to each

workman *by the contractor*, and the body awarding the contract shall cause to be inserted in the contract a stipulation that the provisions of this section will be complied with." (Italics added.)

Labor Code section 1727 provides that "[b]efore making payments to the contractor of money due under a contract for public work, the awarding body shall withhold and retain therefrom all amounts which have been forfeited pursuant to any stipulation in a contract for public work, and the terms of this chapter [which chapter includes the provisions with respect to the payment of prevailing wages]. But no sum shall be withheld, retained or forfeited, except from the final payment, without a full investigation by either the Division of Labor Law Enforcement or by the awarding body." Labor Code section 1733 provides that suit may be brought "by the contractor or his assignee without permission from the State or other authority and is limited to the recovery of the penalties or forfeitures without prejudice to the contractor's or assignee's rights in regard to other matters affecting the contract."

It is provided in Labor Code section 1729 that "[i]t shall be lawful for any contractor to withhold from any subcontractor under him sufficient sums to cover any penalties withheld from him by the awarding body on account of the subcontractor's failure to comply with the terms of this chapter, and if payment has already been made to the subcontractor the contractor may recover from him the amount of the penalty or forfeiture in a suit at law."

Plaintiffs contend that "[t]he right given to the state to withhold funds earned by plaintiffs is, in effect, the right to effect prejudgment attachment." Plaintiffs rely on recent cases which have held various pretrial provisional remedies to be unconstitutional. (*Sniadach* v. *Family Finance Corp.*, 395 U.S. 337 [23 L.Ed.2d 349, 89 S.Ct. 1820]; *McCallop* v. *Carberry,* 1 Cal.3d 903 [83 Cal.Rptr. 666, 464 P.2d 122]; and *Cline* v. *Credit Bureau of Santa Clara Valley,* 1 Cal.3d 908 [83 Cal.Rptr. 669, 464 P.2d 125], wage garnishment; *Blair* v. *Pitchess,* 5 Cal.3d 258 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206], claim and delivery; *Randone* v. *Appellate Department,* 5 Cal.3d 536 [96 Cal.Rptr. 709, 488 P.2d 13], prejudgment attachment; *Adams* v. *Department of Motor Vehicles,* 11 Cal.3d 146 [113 Cal.Rptr. 145, 520 P.2d 961, 64 A.L.R.3d 803], garageman's lien.) Such cases are concerned with statutory provisions for prejudgment seizure or sequestration of a litigant's property without

notice or hearing.[1] The purpose of such legislation is to assure that the claimant will be able to realize the benefits of a judgment in his favor should he be successful in his suit.

The legislation with which we are concerned in the instant case is of a very different nature. Labor Code section 1775 provides for a forfeiture of $25 per day for each workman paid less than the prevailing wage by a contractor or a subcontractor on a public works project. That section also provides that the contractor shall pay each workman the difference between the prevailing wage and the amount actually paid to the workman for each day the workman was paid less than the prevailing wage. Labor Code section 1727 provides that the awarding body shall withhold such forfeited amounts from payments to be made to the contractor under the contract. This legislation does not concern a prejudgment remedy; rather, it involves the imposition by the state of a penalty for violation of the statutory prevailing wage requirements with respect to public works. ■ It is apparent that the purpose of the penalty provisions of Labor Code section 1775 is primarily to secure proper payment to workmen paid less than the prevailing wage, for it is provided therein that "out of the money withheld or recovered or both there shall first be paid the amount due each workman and if insufficient funds are withheld or recovered or both to pay each workman in full the money shall be prorated among all such workmen." As stated in *Shalz* v. *Union School Dist.*, 58 Cal.App.2d 599, at page 606 [137 P.2d 762]: "The purpose and intent of the act is plain and its object should not be defeated by overnice construction. (20 Cal.Jur. 981.) It is not the punishment of the offender in the sense ordinarily applicable to the term, but rather the recovery of the penalty as a fixed sum by way of indemnity to the public by reason of the violation of the statute and to charge him with a pecuniary liability."

■ The Legislature has the power to impose penalties for violations of its statutes. It is a usual method of compelling the performance of duties required by its statutory directives. "Thus a legislature may impose any reasonable penalty it sees fit for the violation of valid regulations. There is no inhibition upon the state to impose such penalties for disregard of its police power as will insure prompt

---

[1] As was said in *Randone* v. *Appellate Department*, 5 Cal.3d 536, at page 547. ". . . we shall explain that rather than creating a special constitutional rule for wages, the *Sniadach* [*Sniadach* v. *Family Finance Corp.*, 395 U.S. 337] opinion returned the entire domain of prejudgment remedies to the longstanding procedural due process principle which dictates that, except in extraordinary circumstances, an individual may not be deprived of his life, liberty or property without notice and hearing."

obedience to the requirements of such regulations. [Citation.]" (*Shalz* v. *Union School Dist., supra,* 58 Cal.App.2d 599, 606; see *Allied Properties* v. *Dept. of Alcoholic Beverage Control,* 53 Cal.2d 141, 150 [346 P.2d 737]; *Merco Constr. Engineers, Inc.* v. *Los Angeles Unified Sch. Dist.,* 274 Cal.App.2d 154, 159 [79 Cal.Rptr. 23].)

In *Metropolitan Water Dist.* v. *Whitsett,* 215 Cal. 400 [10 P.2d 751], the California Supreme Court held that the California prevailing wage law then in existence was constitutional, reasoning that such legislation was essentially a minimum wage law. The court stated (215 Cal. at pp. 417-418): "Minimum wage statutes applicable to public work have been uniformly upheld on the theory that the state as the employer having full control of the terms and conditions under which it will contract may, through its legislatures, and within constitutional limits, provide the wage which shall be paid to its employees and that the payment of a less sum shall be unlawful. In 1897, the legislature of the state enacted a statute prescribing two dollars per day as a minimum wage to be paid for labor on public works. (Stats. 1897, p. 90.) This wage may or may not have been more than the prevailing wage for labor in similar employment of that day. Apparently the validity of that statute has never been questioned, and the act was repealed in 1931. (Stats. 1931, p. 909.) Under all of the authorities cited, or which have come to our notice, it is uniformly held that the legislature itself, unless constitutionally restrained, may fix in a definite amount the minimum wage for labor on public work."[2]

In *Atkin* v. *Kansas,* 191 U.S. 207 [48 L.Ed. 148, 24 S.Ct. 124], the United States Supreme Court upheld the validity of Kansas legislation providing for an eight-hour workday and the payment of not less than the current rate of per diem wages in the locality where the work was performed to all laborers, workmen, mechanics and others employed by or on behalf of the State of Kansas or one of its political subdivisions. The Supreme Court stated (191 U.S. at pp. 222-223 [48 L.Ed. at p. 158]): "It cannot be deemed a part of the liberty of any contractor that *he* be

---

[2] In *Kugler* v. *Yocum,* 69 Cal.2d 371, at page 378, footnote 4 [71 Cal.Rptr. 687, 445 P.2d 303], the Supreme Court stated: "The current counterpart of the statute involved in *Whitsett* [*Metropolitan Water Dist.* v. *Whitsett, supra,* 215 Cal. 400] is Labor Code section 1773. Although this court has not directly confronted an attack on the validity of section 1773, we have implicitly sustained it. (*Franklin* v. *City of Riverside* (1962) 58 Cal.2d 114 [23 Cal.Rptr. 401, 373 P.2d 465]; contra, *Parrack* v. *City of Phoenix* (1959) 86 Ariz. 88 [340 P.2d 997]; *Adams* v. *City of Albuquerque* (1957) 62 N.M. 208 [307 P.2d 792].) Moreover, the federal Walsh-Healey Act (41 U.S.C. § 35(b)) contains the same prevailing wage provision for contracts with the federal government: its validity has been upheld. (*Perkins* v. *Lukens Steel Co.* (1940) 310 U.S. 113 [84 L.Ed. 1108, 60 S.Ct. 869].)"

allowed to do public work in any mode he may choose to adopt, without regard to the wishes of the State. On the contrary, it belongs to the State, as the guardian and trustee for its people, and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of its municipalities. No court has authority to review its action in that respect. Regulations on this subject suggest only considerations of public policy. And with such considerations the courts have no concern. [¶] If it be contended to be the right of every one to dispose of his labor upon such terms as he deems best—as undoubtedly it is—and that to make it a criminal offense for a contractor for public work to permit or require his employee to perform labor upon that work in excess of eight hours each day, is in derogation of the liberty both of employees and employer, it is sufficient to answer that no employee is entitled, of absolute right and as a part of his liberty, to perform labor for the State; and no contractor for public work can excuse a violation of his agreement with the State by doing that which the statute under which he proceeds distinctly and lawfully forbids him to do."[3]

---

[3] Plaintiffs question the validity of *Whitsett* and *Atkin*, contending that they have been overruled by implication by those more recent cases which hold that while employment by the state is not a right, still such employment and the granting of privileges by the state cannot be conditioned on a deprivation of a party's constitutional rights. (See *Frost Trucking Co.* v. *R.R. Com.*, 271 U.S. 583, 594 [70 L.Ed. 1101, 1105, 46 S.Ct. 605, 47 A.L.R. 457]; *Purdy & Fitzpatrick* v. *State of California*, 71 Cal.2d 566, 578 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194]; *Vogel* v. *County of Los Angeles*, 68 Cal.2d 18, 21 [64 Cal.Rptr. 409, 434 P.2d 961].)

In *Purdy & Fitzpatrick* v. *State of California, supra*, 71 Cal.2d 566, the California Supreme Court held that Labor Code section 1850, which prohibited the employment of aliens on public works, violated the equal protection clause of the Fourteenth Amendment. In so holding, the court overruled *City of Pasadena* v. *Charleville*, 215 Cal. 384 [10 P.2d 745], which upheld the constitutionality of Labor Code section 1850. In *City of Pasadena* the court had relied on *Heim* v. *McCall*, 239 U.S. 175 [60 L.Ed. 206, 36 S.Ct. 78], which also upheld a statute barring aliens on public works. In *Purdy & Fitzpatrick* the court noted that in *Heim* the Supreme Court purported to rely on dicta in *Atkin* v. *Kansas, supra*, 191 U.S. 207. The court stated (71 Cal.2d at pp. 582-583): "The United States Supreme Court in *Heim* v. *McCall, supra*, 239 U.S. 175, the case relied upon by this court in originally upholding the constitutionality of Labor Code section 1850, rested its decision to sustain the statute there involved squarely upon the proposition that the state possesses all the rights of a private employer and therefore encounters no restrictions under the Fourteenth Amendment in the area of public employment. [Fn. omitted.] The court held that a state may, therefore, freely regulate the terms and conditions of 'public' employment as no person has a vested right to work for the state or any of its public agencies upon public work, citing *Atkin* v. *Kansas* (1903) 191 U.S. 207, 222-223 [48 L.Ed. 148, 157-158, 24 S.Ct. 124]. [¶] Commentators have seriously questioned the holding in *Heim*, especially its reliance upon the dicta of *Atkin* v. *Kansas, supra*, 191 U.S. 207. [Fn. omitted.] In *Atkin*, the state sought to limit the hours of daily work for those employed on public works. An employer brought suit and challenged the regulation as an infringement of his right to contract. The United States Supreme Court held that the state, as the ultimate employer, exercises the right to prescribe the

In *West Coast Hotel Co.* v. *Parrish,* 300 U.S. 379 [81 L.Ed. 703, 57 S.Ct. 578, 108 A.L.R. 1330], the Supreme Court upheld the constitutional validity of the minimum wage law of the State of Washington applicable to the employment of women and minors. The employer attacked the statute as being repugnant to the due process clause of the Fourteenth Amendment of the Constitution of the United States (300 U.S. at p. 388 [81 L.Ed. at pp. 706-707]). The Supreme Court concluded that minimum wage legislation did not constitute a deprivation of freedom of contract, stating as follows (300 U.S. at pp. 392-393, 399 [81 L.Ed. at pp. 709, 712]): "This power under the Constitution to restrict freedom of contract has had many illustrations [fn. omitted]. That it may be exercised in the public interest with respect to contracts between employer and employee is undeniable . . . . In dealing with the relation of employer and employed, the legislature has necessarily a wide field of discretion in order that there may be suitable protection of health and safety, and that peace and good order may be promoted through regulations designed to insure wholesome conditions of work and freedom from oppression . . . . [¶] The legislature had the right to consider that its minimum wage requirements would be an important aid in carrying out its policy of protection. The adoption of similar requirements by many States evidences a deepseated conviction both as to the presence of the evil and as to the means adapted to check it. *Legislative response to that conviction cannot be regarded as arbitrary or capricious, and that is all we have to decide.* Even if the wisdom of the policy be regarded as debatable and its effects uncertain, still the legislature is entitled to its judgment." (Italics added.)

In *Perkins* v. *Lukens Steel Co.,* 310 U.S. 113 [84 L.Ed. 1108, 60 S.Ct. 869], the Supreme Court considered the validity of the federal Public Contracts Act of June 1936 which required that sellers who manufacture or furnish materials (in amounts exceeding $10,000) for or to the United States must pay their employees engaged in the manufacture or furnishing of such supplies not less than the prevailing minimum wage. Therein the Supreme Court stated (310 U.S. at p. 127 [84 L.Ed. at pp. 1114-1115]): "Like private individuals and businesses, the Government

conditions upon which it would permit public work to be done on its behalf. In *Heim,* the court held *Atkin* controlling, without any apparent consideration of the differences between the two cases: *Atkin* involved a non-discriminatory statute; the party attacking the statute, an employer, asserted merely his right of freedom of contract; the case involved economic regulation and the court properly invoked a test of reasonableness. [Fn. omitted.] In *Heim,* on the other hand, the court faced a discriminatory statute which excluded employees from otherwise lawful labor because of their status as aliens."

It is clear that, contrary to plaintiffs' contention, the court in *Purdy & Fitzpatrick* did not question the validity of the basic decision in *Atkin* v. *Kansas* which upheld the Kansas maximum hour and prevailing wage law.

enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases. [Fn. omitted.] Acting through its agents as it must of necessity, the Government may for the purpose of keeping its own house in order lay down guide posts by which its agents are to proceed in the procurement of supplies, and which create duties to the Government alone. It has done so in the Public Contracts Act."

However, it is plaintiffs' contention that under the prevailing wage legislation challenged here plaintiffs are subject to a deprivation of their property without notice or a hearing. ▪ . As was said by the United States Supreme Court in *Lambert* v. *California*, 355 U.S. 225, 228 [2 L.Ed.2d 228, 231, 78 S.Ct. 240], "[e]ngrained in our concept of due process is the requirement of notice. Notice is sometimes essential so that the citizen has the chance to defend charges. Notice is required before property interests are disturbed, before assessments are made, before penalties are assessed. Notice is required in a myriad of situations where a penalty or forfeiture might be suffered for mere failure to act."

Labor Code section 1775 does provide for the giving of notice to the effect that violations of the prevailing wage law will result in the imposition of certain penalties. Thus it is there provided as follows: ". . . and the body awarding the contract shall cause to be inserted in the contract a stipulation that the provisions of this section [Labor Code section 1775] will be complied with." The provisions of the section as to which the parties to the contract stipulate there will be compliance are, of course, those provisions relating to the $25 per day forfeiture by the contractor with respect to each workman paid less than the prevailing rate required for work done by the contractor or any subcontractor. The parties are also required to stipulate to those provisions of law relating to payment of wages to workmen representing the difference between prevailing wages and those paid workmen for each day the workmen were paid less than prevailing wages. In the case presently before this court such a stipulation with respect to prevailing wages was entered into by the parties. Thus, in the Standard Specifications section 7-1.01D it is provided in pertinent part as follows: "The Contractor shall comply with Labor Code Section 1775. In accordance with said Section 1775 the Contractor shall forfeit as a penalty to the State of California, $25 for each calendar day or portion thereof, for each workman paid less than the stipulated prevailing rates for such work or craft in which such workman is employed for any work done under the contract by him or by any subcontractor under him in violation of the provisions of the

Labor Code and in particular, Labor Code Sections 1770 to 1780, inclusive. In addition to said penalty and pursuant to said Section 1775, the difference between such stipulated prevailing wage rates and the amount paid to each workman for each calendar day or portion thereof for which each workman was paid less than the stipulated prevailing wage rate shall be paid to each workman by the Contractor."

Furthermore, the trial court found as follows: "The STATE sent a letter to plaintiffs on December 23, 1971, giving notice that WRIGHT and HECK had failed to pay prevailing wages and fringe benefits to their employees pursuant to the terms of the contract."

Plaintiffs point out, however, and the trial court found that plaintiffs were not afforded a hearing prior to the imposition of the penalty. In *Merco Constr. Engineers, Inc.* v. *Los Angeles Unified Sch. Dist., supra,* 274 Cal.App.2d 154, the court considered the constitutionality of the penalty provisions of the Subletting and Subcontracting Fair Practices Act (Gov. Code, §§ 4100-4113). The act provided that a contractor must list all proposed subcontractors in his bid and allowed substitutions or deletions of subcontractors only on certain conditions. The act provided the awarding authority various options in penalizing a prime contractor who violated the act. In its discretion the awarding authority could (1) cancel the contract, (2) assess a penalty in an amount no greater than 10 percent of the subcontract involved or (3) both cancel the contract and assess a penalty. The appellate court held the penalty provision of the act (Gov. Code, § 4110) to be unconstitutional as violative of the due process clause because the statute granted the awarding body great discretion in determining the nature and extent of the penalty to be assessed and failed to give the contractor any opportunity to be heard. Thus the court stated (274 Cal.App.2d at p. 166): "In the case at bar the penalty assessed was the monetary maximum of $77,000. In addition, defendant could have cancelled the prime contract. On the other hand it could have assessed no penalty whatever. The proceeds of the penalty went to defendant. Having in mind the frequent squabbles between contractors and awarding authorities, such a power to be lenient or stern, assumes rather alarming proportions. That, however, is perhaps a matter of legislative judgment. The aspect of section 4110 which, we are certain, violates basic notions of due process is that all this can be done without notice or hearing. As far as the statute is concerned, all that defendant had to do was to send plaintiff a bill or, easier yet, credit itself with $77,000 in the final accounting. [Fn. omitted.] [¶] The constitutional requirement for a

hearing was recently so exhaustively discussed in *Endler* v. *Schutzbank*, 68 Cal.2d 162, 169-173 [65 Cal.Rptr. 297, 436 P.2d 297] and *Sokol* v. *Public Utilities Com.*, 65 Cal.2d 247, 253-256 [53 Cal.Rptr. 673,˙418 P.2d 265], that there is nothing for this court to add. It should be pointed out that we are not faced with the problem whether due process would demand a hearing if the statute provided for a mandatory penalty of a specific percentage, as did the predecessor statute to section 4110, former section 4106. We deal with a law which, on its face, gives the awarding authority a very wide discretion, but provides no opportunity to the party most affected, the contractor, to present any facts or arguments on which the exercise of that discretion might be predicated."

That in *Merco* the appellate court was particularly concerned with the fact that the statute in question gave the awarding authority wide discretion with respect to the nature and extent of the penalty assessed is clear from the court's discussion of the lack of need for a hearing under the prior law. Thus the court stated (274 Cal.App.2d at p. 168) as follows: "We are particularly persuaded that the Act and especially section 4110 do not contemplate a hearing by the fact that until 1961, former section 4106, the predecessor of section 4110, called for a mandatory penalty of a flat 20 percent. [Fn. omitted.] Of course no hearing is necessary when no discretion is involved and all that needs to be done is to divide a certain figure by 100 and multiply by 20. Apparently, when the law was changed in 1961 and the nature and size of the monetary penalty first became a matter of discretion, no thought was given to the fact that certain constitutional considerations *now came into play.*" (Italics added.)

Under the California prevailing wage law the responsible awarding authority has no discretion with respect to the imposition of penalties. It is allowed only to assess $25 per calendar day for each workman paid less than the stipulated prevailing wage. Furthermore, the contractor may challenge the state's assessment in a legal action, for which provision is made in Labor Code section 1733. In *Madonna* v. *State of California*, 151 Cal.App.2d 836 [312 P.2d 257], a contractor brought suit against the State of California to recover penalties withheld from the final payment due him under a highway construction contract. The appellate court affirmed the trial court's determination that the contractor's suit was barred because he failed to bring it within the 90-day period following completion of the contract pursuant to Labor Code sections 1732 and 1733. With respect to certain constitutional arguments raised by the contractor the appellate court stated (151 Cal.App.2d at p. 841): "Since the Legislature has provided in section 1733 for a

proceeding to fully litigate and establish the contractor's right, if any, to recover the penalties or forfeitures withheld (although within a limited time), there is no violation of due process of law. [¶] In the instant case, appellant was given notice of the date of completion of the contract and acceptance of the job by the State Highway Engineer's letter of May 6, 1955. He had more than ample time in which to have filed his action within the 90-day period of time allowed by the statute. [¶] The Public Wage Rate Act of 1931 (Stats. 1931, p. 910, now codified in the Lab. Code, pt. 7, chap. 1, §§ 1720 et seq.) has been held not to violate the Constitution. (*Metropolitan Water Dist.* v. *Whitsett*, 215 Cal. 400 [10 P.2d 751].)"

*Devitt* v. *Haglin Co.*, 248 App.Div. 298 [289 N.Y.S. 626], involved the New York labor law which provided that before the state made payments due on a contract for a public improvement, the state comptroller was to require the contractor and the contractor's subcontractors to file a certified statement of wages owed to any laborers on account of work performed under the contract. It was further provided that the state might deduct from moneys to be paid the contractor "the sum or sums admitted by any contractor or subcontractor" to be owing for wages in his certified statement and such sum might be withheld for the benefit of the unpaid workmen. In *Devitt* a subcontractor failed to pay plaintiffs and the subcontractor filed a certified statement admitting this failure. The state comptroller withheld from payments due to the general contractors on the job the amounts owed to plaintiffs. The court concluded that the statutory provisions validly provided for withholding from payments due to the general contractor where the subcontractor failed to pay his employees, stating (289 N.Y.S. at p. 631): "From a reading of the sections, and from the growing tendency of the Legislature to protect laborers on public jobs, and from all the surrounding facts and circumstances, it is apparent that the Legislature intended to assure to all laborers on public work the payment of their wages, no matter whether they were employees of the person with whom the state was doing business directly, or of some subcontractor who was unknown to the state."

In *Devitt* the prime contractors argued that the statute so construed deprived them of their property without due process of law. The appellate court disagreed, stating (289 N.Y.S. at pp. 631-632): "We are here dealing with an agreement between individual corporations and the state, and the law is well settled that one who undertakes to perform public work for the state must take the contract as the state tenders it, or leave it altogether. Campbell v. City of New York, 244 N.Y. 317, 155

N.E. 628, 50 A.L.R. 1473. [¶] The constitutional liberty of the appellants has not been infringed, because they have no vested right to deal with the state except on such terms as the Legislature may prescribe. People ex rel. Cossey v. Grout, 179 N.Y. 417, 423, 72 N.E. 464, 1 Ann.Cas. 39; Atkin v. Kansas, 191 U.S. 207, 24 S.Ct. 124, 48 L.Ed. 148. . . . [¶] Appellants were not obliged to enter into this contract; they did so of their own free will. The state having determined that the provisions of the two sections in question should be a condition upon which this public work should be done, and appellants having accepted such conditions, the appellants cannot now complain that their constitutional liberty has been infringed."

■ Under the statutory scheme presently before us, in acting pursuant to Labor Code section 1727 the state did not take property belonging to plaintiffs; rather, it withheld sums pursuant to the terms of its contract with plaintiffs. An involuntary burden was not placed upon plaintiffs by virtue of the legislation reviewed herein. Plaintiffs' execution of the contract with knowledge of the penalties to be imposed if they or their subcontractors failed to pay the prevailing wages required under the contract was voluntary, and constituted consent to the provisions now challenged. (See *Winder Bros.* v. *Sterling,* 118 Tex. 268 [12 S.W.2d 127, 128-129].)

The prevailing wage legislation herein involved provides for notice with respect to the governmental agency's prevailing wage determination prior to the submission of bids on public works projects. (Lab. Code, § 1773.2.) It also provides a procedure for contesting the agency's determination. (Lab. Code, § 1773.4.) Thereafter the contractor submits a bid based on the agency's determination with respect to prevailing wages to be paid, and the contract, subsequently awarded for said public work in accordance with statutory requirements, contains notice of the forfeiture to be made by the contractor if either he or his subcontractor fails to comply with the contractual provisions relating to the payment of prevailing wages. (Lab. Code, § 1775.) The contractor cannot claim that he lacked notice of, or an opportunity to contest, the prevailing wage provision as determined by the agency.

When the contractor submits his bid based on the prevailing wage determination and freely enters into a contract for the public work involved, in which contract he stipulates to be subject to the penalty provisions of the prevailing wage law, he cannot be heard to say that he was denied due process of law with respect to the enforcement of the penalty provisions.

As was stated by the court in *Schalz v. Union School Dist., supra,* 58 Cal.App.2d 599, at pages 607-608: "It is strictly within the province of the Legislature to adopt measures to reduce the evils of the exploiting of wages. The widespread adoption of similar statutes by so many states evidences a general conviction that minimum wage requirements are definitely in the interest of the general public welfare. Even if the wisdom of the policy is regarded as debatable and its effects uncertain, still the Legislature is entitled to its own judgment. The courts are unauthorized to deal with the question of policy. This is the sole province of the Legislature. It is for the Legislature to determine the necessity of such enactment, and once having so determined it is elementary to add that every presumption is in favor of its validity. [¶] ... This general question also was considered by the United States Supreme Court in *Chicago, B. & Q. R. Co. v. McGuire,* 219 U.S. 549 [31 S.Ct. 259, 55 L.Ed. 328], in which the court said: [¶] 'Freedom of contract is a qualified and not an absolute right. There is no absolute freedom to do as one wills or to contract as one chooses. The guarantee of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community.' "

III

THE EQUAL PROTECTION ISSUE

Plaintiffs contend as follows: "Legislative classification must rest upon some substantial and intrinsic difference which suggests a reason for and justifies the particular legislation. There is neither authority nor persuasive reasoning for the arbitrary imposition of burdens upon public works contractors. The prevailing wage laws, stripped of their immunity from constitutional limitations, deny public works contractors equal protection of the laws." Plaintiffs argue that the prevailing wage laws discriminate against public works contractors by requiring them to pay prevailing wages whereas contractors employed by private persons and entities are not required to pay prevailing wages. Furthermore, plaintiffs complain that the prevailing wage legislation is not applicable to all public works contracts in that the California legislation does not apply to contracts awarded by a charter city or other municipal corporation and, moreover, that the law does not apply to public works construction carried out by a public agency using its own public employees.

Plaintiffs make no claim that the legislation here involved discriminates with respect to a "fundamental right" or is based upon a "suspect classification." (See *In re Antazo*, 3 Cal.3d 100, 110-111 [89 Cal.Rptr. 255, 473 P.2d 999]; *Westbrook* v. *Mihaly*, 2 Cal.3d 765, 784-785 [87 Cal.Rptr. 839, 471 P.2d 487]; *Purdy & Fitzpatrick* v. *State of California, supra,* 71 Cal.2d 566, 578-579.) Accordingly, we must apply here the criterion which has been termed the "rational relationship" test to determine whether the prevailing wage legislation presently before us is violative of equal protection guarantees. Thus in *Westbrook* v. *Mihaly, supra,* 2 Cal.3d 765, at page 784, the California Supreme Court stated: "In the area of economic regulation, the high court has exercised restraint, investing legislation with a presumption of constitutionality and requiring merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose. [Citations.]"

In *Russell* v. *Carleson*, 36 Cal.App.3d 334, at page 343 [111 Cal.Rptr. 497], it was stated: "Directing our attention to the constitutional guarantee of equal protection of the laws, we observe that the latter guarantee 'compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment.' (*Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194].) '[T]he Legislature is vested with wide discretion in making the classification and . . . its decision as to what is a sufficient distinction to warrant the classification will not be overthrown by the courts unless it is palpably arbitrary and beyond rational doubt erroneous. [Citations.] . . . Only invidious discrimination offends the equal protection clause [citation]; the Legislature need not treat similar evils identically or legislate as to all phases of a field at once [citation]; legislative classification is permissible when it is based upon some distinction reasonably justifying differentiation in treatment [citations]; a classification is not void because it does not embrace within it every other class which might be included [citation] . . . .' (*People* v. *Aguiar, supra,* 257 Cal.App.2d at p. 604 [65 Cal.Rptr. 171].) ' "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." [Citation.]' (*Dandridge* v. *Williams* (1970) 397 U.S. 471, 485 [25 L.Ed.2d 491, 502, 90 S.Ct. 1153].) (See also *Allied Stores of Ohio* v. *Bowers* (1959) 358 U.S. 522, 527-528 [3 L.Ed.2d 480, 485-486, 79 S.Ct. 437]; *In re Ricky H., supra,* 2 Cal.3d at p. 522 [86 Cal.Rptr. 76, 468 P.2d 204].)"

However, as was said in *McLaughlin* v. *Florida*, 379 U.S. 184, 191 [13 L.Ed.2d 222, 228, 85 S.Ct. 283]: "Judicial inquiry under the Equal

Protection Clause . . . does not end with a showing of equal application among the members of the class defined by the legislation. The courts must reach and determine whether the classifications drawn in a statute are reasonable in light of its purpose—in this case, whether there is an arbitrary or invidious discrimination between those classes covered by Florida's cohabitation law and those excluded."

Little has been written in judicial opinions concerning the purpose of the California legislation. However, cases have expounded on the purpose of the Davis-Bacon Act (40 U.S.C. § 276a et seq.)[4] The Supreme Court stated in *U.S.* v. *Binghamton Construction Co.,* 347 U.S. 171, at pages 176-177 [98 L.Ed. 594, 599, 74 S.Ct. 438]: "The language of the [Davis-Bacon] Act and its legislative history plainly show that it was not enacted to benefit contractors, but rather to protect their employees from substandard earnings by fixing a floor under wages on Government projects." And in *International U. of Operating Eng. Local 627* v. *Arthurs* (W.D. Okla. 1973) 355 F.Supp. 7, at page 8, it was stated: "The purpose of the Davis-Bacon Act is to provide protection to local craftsmen who were losing work to contractors who recruited labor from distant cheap-labor areas. S.Rept. 963, Mar. 17, 1964 (to accompany H.R. 6041), 1964 U.S. Code Congressional and Administrative News, pp. 2339, 2340. Some contractors pay wages according to collective bargaining agreements. But even though these contractors usually are required to pay higher wage scales, they can still compete with nonunion contractors for public contract work because of the Davis-Bacon Act prevailing wage scale provision. Noncompliance with the Davis-Bacon Act makes it impossible for all contractors to compete. There is thus injury to the laborers and mechanics, as well as injury to contractors and labor organizations."

It has been said that the provision for payment of prevailing wages on state construction works serves a public policy in that the state will benefit from "the superior efficiency of well-paid labor working during reasonable hours" and that such benefit justifies the employment of men on "less favorable terms than could be secured by the stress of competition." (65 Am.Jur.2d, Public Works and Contracts, § 199, p. 87.)

With respect to plaintiffs' contention that the prevailing wage law discriminates against public works contractors because it does not apply to contractors working on private construction projects, it has been said

---

[1] It has been stated by the California State Attorney General (54 Ops.Cal.Atty.Gen. 31, 34): "California has a prevailing wage law similar to the Davis-Bacon Act. . . ."

that the myriad differences between public and private entities provides a sufficient rational basis for different legislative treatment. Thus in *Dias v. Eden Township Hospital Dist.*, 57 Cal.2d 502, at page 504 [20 Cal.Rptr. 630, 370 P.2d 334], the court stated: "Public agencies, generally speaking, afford a proper subject for legislative classification. [Citation.]" (See *Flournoy* v. *State of California*, 230 Cal.App.2d 520, 524 [41 Cal.Rptr. 190]; *Vinnicombe* v. *State of California*, 172 Cal.App.2d 54, 59 [341 P.2d 705].)

It was specifically decided in *Bishop* v. *City of San Jose*, 1 Cal.3d 56, 64 [81 Cal.Rptr. 465, 460 P.2d 137], that the California prevailing wage legislation was applicable only to public construction work let out on contract and was not applicable to construction projects as to which a public agency used its own forces. Thereafter the Legislature amended Labor Code section 1771 (Stats. 1974, ch. 1202, § 1, p. 518) to reflect the court's ruling in *Bishop* v. *City of San Jose, supra*.[5]

Plaintiffs contend that this legislative distinction between workers employed by private contractors on public works and public employees engaged in building public projects is unconstitutionally discriminatory. This claim has been considered by courts in other jurisdictions. Thus the reason for the different treatment accorded public and private employees working on public works projects was succinctly set forth by the court in *City of Monmouth* v. *Lorenz*, 30 Ill.2d 60 [195 N.E.2d 661, 18 A.L.R.3d 937], wherein the court stated (195 N.E.2d at p. 664): "Here the legislation has put into a single class public bodies and construction contractors which are for most purposes two entirely different classes. It is true that each class may employ laborers, workmen and mechanics for the construction of public works and that the legislation in question deals only with this common characteristic of the two classes. Labels may be deceptive, however, and labeling the two classes as employers of workmen for the construction of public works does not cover the vital and real differences between the two classes of employers and their respective employment relationships with their employees. Government employment is generally of a steady nature and entails fringe benefits, whereas employment by a private contractor is unusually seasonal and does not carry like fringe benefits. These disadvantages of seasonal employment and lack of fringe benefits are compensated, of course, by the payment of higher wages. The workmen employed by the public

---

[5] The relevant portion of Labor Code section 1771 as amended is as follows: "This section is applicable only to work performed under contract, and is not applicable to work carried out by a public agency with its own forces."

body may do as well as or better in the long run than the workmen employed by a private contractor although his *rate* of pay be not as high. The object of the legislation in question is to insure that workmen on public projects receive the same economic benefits as workmen on projects of a similar nature by regulating the rate of pay they are to receive, but rate of pay is just one factor in determining the economic benefits to be derived from employment, and where, as here, the two classes of employers are by their very nature in such a position that they cannot and do not confer similar economic benefits on their employees exclusive of the rate of pay, an act requiring both classes to pay their employees on construction at the same rate violates the equal protection clause of both the Fourteenth Amendment to the Federal Constitution and section 22 of article IV of the Illinois constitution." (See *City of Joplin* v. *Industrial Commission of Missouri* (Mo. 1954) 329 S.W.2d 687, 692; *Seybold* v. *City of Chicago*, 7 Ill.App.3d 932 [288 N.E.2d 899, 900].)

■ The differences between public employment and employment by a private contractor noted in *City of Monmouth* v. *Lorenz, supra*, 30 Ill.2d 60 [195 N.E.2d 661], provide a rational basis for the distinctions made between those two types of employment by Labor Code section 1771.

Plaintiffs contend that there is no rational reason for application of prevailing wage laws to public works contracts and not to public contracts in general. Public works are defined in Labor Code section 1720 as follows: "As used in this chapter 'public works' means: [¶] (a) Construction, alteration, demolition or repair work done under contract and paid for in whole or in part out of public funds, except work done directly by any public utility company pursuant to order of the Public Utilities Commission or other public authority. [¶] (b) Work done for irrigation, utility, reclamation and improvement districts, and other districts of this type. 'Public work' shall not include the operation of the irrigation or drainage system of any irrigation or reclamation district, except as used in Section 1778 relating to retaining wages. [¶] (c) Street, sewer or other improvement work done under the direction and supervision or by the authority of any officer or public body of the state, or of any political subdivision or district thereof, whether such political subdivision or district operates under a freeholder's charter or not. [¶] (d) The laying of carpet done under a building lease-maintenance contract and paid for out of public funds. [¶] (e) The laying of carpet in a public building done under contract and paid for in whole or part out of public funds."

Public works are further defined for the purposes of the payment of prevailing wages to include certain contracts between private persons as set forth in Labor Code section 1720.2 as follows: "For the limited purposes of Article 2 (commencing with Section 1770) of this chapter, 'public works' also means any construction work done under private contract when all of the following conditions exist: [¶] (a) The construction contract is between private persons. [¶] (b) The property subject to the construction contract is privately owned, but, upon completion of the construction work, more than 50 percent of the assignable square feet of the property is leased to the state or a political subdivision for its use. [¶] (c) The lease agreement between the lessor and the state or political subdivision, as lessee, was entered into prior to the construction contract." And in Labor Code section 1771, with respect to the payment of prevailing wages it is provided in part as follows: "This section is applicable to contracts let for maintenance work."

The statutory scheme, the cases decided under the California prevailing wage law and under the Davis-Bacon Act, as well as the legislative history available with respect to the Davis-Bacon Act, show clearly that prevailing wage legislation was designed to benefit the construction worker on public construction projects. ■ The Legislature may constitutionally single out a particular segment of industry for regulation without necessarily running afoul of the equal protection clauses of the state and federal Constitutions. As was said in *Brown* v. *Merlo*, 8 Cal.3d 855, at page 861 [106 Cal.Rptr. 388, 506 P.2d 212, 66 A.L.R.3d 505], the " 'equal protection' preserved by both state and federal Constitutions, . . . 'does not preclude the state from drawing any distinctions between different groups of individuals' (*In re King* (1970) 3 Cal.3d 226, 232 [90 Cal.Rptr. 15, 474 P.2d 983]), but it does require that, at a minimum, 'persons similarly situated with respect to the legitimate purpose of the law receive like treatment.' [Citations.]" There is a natural, intrinsic distinction between public works contracts and other public contracts. The Legislature having ascertained the existence of a situation in the field of construction of public works which called for remedial action could act to remedy that situation without making the legislation applicable to every public contract.

Appellants contend that the California prevailing wage law constitutes a denial of equal protection because it does not apply to public works contracts awarded by charter cities, citing *City of Pasadena* v. *Charleville*, 215 Cal. 384 [10 P.2d 745], and *Smith* v. *City of Riverside*, 34 Cal.App.3d 529, 535 [110 Cal.Rptr. 67], or to public works projects constructed by a municipal corporation (with its own forces), citing *Bishop* v. *City of San*

*Jose, supra,* 1 Cal.3d 56.[6] In the instant case no question is presented with respect to the application of the prevailing wage statutes to a construction project being carried out by a charter city or other municipal corporation. In the light of the distinctions noted in *Bishop* v. *City of San Jose, supra,* 1 Cal.3d 56, and cases of a kindred nature, no purpose would be served by an extended discussion of plaintiffs' contention in this opinion. (See *In re Cregler,* 56 Cal.2d 308, 313 [14 Cal.Rptr. 289, 363 P.2d 305]; *Kramer* v. *Boynton,* 258 Cal.App.2d 171, 176 [65 Cal.Rptr. 669].)

Plaintiffs claim that the federal Davis-Bacon Act is also arbitrary and discriminatory in that it does not generally apply to employees of contractors on public contracts for the manufacture or furnishing of materials, supplies, articles and equipment. This argument is akin to the argument presented with respect to the distinction made by the California law between public works projects and other public contracts. As set forth hereinabove, the distinction has a rational basis in the light of the purpose of the law.

Plaintiffs contend that "[a] statute which subjects property to liability without the fault of the owner thereof is invalid." The case cited by plaintiffs in support of this proposition, *State* v. *A/S Nye Kristianborg* (D.Md. 1949) 84 F.Supp. 775, 780,[7] was concerned with whether an amendment to a statute could be applied retrospectively. The court concluded that if the statute imposed liability on the ship itself irrespective of fault by or of personal liability of the owners of the ship, it could not be applied retroactively without violating due process.

In the case presently before this court there is no question of retroactive application of a statute so as to impair property rights. ▇ Plaintiffs entered into a contractual agreement to the effect that they would comply with Labor Code section 1775 and that they would forfeit to the state $25 per day for each workman paid less than

---

[6] The determination made in *Bishop* has been set forth hereinabove.

[7] The language relied on by plaintiffs is as follows: "Even if it were possible, as a matter of statutory construction, to find that it was the intention of the Maryland Legislature to make the amending statute retroactive in effect, it still would not be possible to do so, because that would run counter to both Maryland and federal constitutional limitations. It requires no elaboration to demonstrate that a statute which, as we have seen, would impair a property right, by subjecting one's property to the claims of another, without personal fault or legal liability of the owner, destroys vested rights of property, and is therefore clearly invalid. It is a taking of property without due process of law contrary to the 14th Amendment of the Federal Constitution and also contrary to established constitutional principles in Maryland."

the prevailing wage by either plaintiffs or by their subcontractors, as well as pay to each such workman the difference between the prevailing wage and the amount the workman had received. Thus when subcontractors Wright and Heck failed to pay prevailing wages to their workmen, plaintiffs became contractually liable to pay the penalty to the state as well as to pay the wronged workmen the difference in wages. Accordingly, it cannot be said that the statute subjects plaintiffs' property to a taking without due process or equal protection of the law.

Finally plaintiffs contend that "[t]he submission of certified payrolls by a subcontractor showing payment of prevailing wages satisfies all obligations of the contractor under the prevailing wage statutes." ▮ As noted hereinabove, Labor Code section 1775 requires the contractor to pay penalties assessed by the state as well as the difference owed to workmen paid less than the prevailing wage. These statutory obligations are imposed on the contractor whether the contractor or a subcontractor failed in his obligation to pay prevailing wages. Thus the statutory scheme requires more of the contractor than procurement of certified payrolls from a subcontractor showing payment of prevailing wages. It must be remembered that a prime contractor subcontracts work on a construction project primarily for his own convenience. The Legislature has expressed its intention that the prevailing wage provisions apply to all workmen on public projects and that the provisions of the act not be frustrated because of the subcontracting of work required to be done under the provisions of the prime contract. It is not unreasonable to require that the contractor assume contractual responsibility for his subcontractor's compliance with the prevailing wage law.

The legislation in question does not violate either due process or the equal protection of the law. No unconstitutional burdens have been imposed on plaintiffs. No basis for a reversal of the judgment has been shown.

The judgment is affirmed.

Allport, J., and Potter, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied April 15, 1976.